IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MEGAN D.,[1]                          )
                                      )
            Plaintiff,                )
                                      )
vs.                                   )    Case No. 3:25-CV-430-MAB[2]
                                      )
COMMISSIONER OF SOCIAL                )
SECURITY,                             )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Megan D. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision is REVERSED and this matter is REMANDED for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

### PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI in May 2022, alleging disability beginning on March 30, 2019 (Tr. 205-218). Plaintiff's applications were initially denied on January 19,

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition after consent of the parties (Doc. 9) and pursuant to the Order of Reassignment contained in SDIL Administrative Order 408 (Doc. 14).

2023 (Tr. 133-140) and at the reconsideration level on September 13, 2023 (Tr. 149-156). Thereafter, a hearing was held virtually before Administrative Law Judge Marcus Johns on February 8, 2024 (Tr. 42-67). Following the hearing, ALJ Johns issued an unfavorable decision on March 15, 2024 (Tr. 17-36). Plaintiff timely filed a request for review, but that request was denied by the Appeals Council (Tr. 1-6). Accordingly, the ALJ's decision became the final decision of the Commissioner of Social Security and Plaintiff exhausted her administrative remedies (Tr. 1).

Plaintiff filed her Complaint with this Court on March 28, 2025 (Doc. 1). Thereafter, the Commissioner submitted a Transcript of the Administrative Record on May 19, 2025 (Doc. 10). Plaintiff's Brief was filed on July 17, 2025 (Doc. 15), and the Commissioner's Brief was filed on August 29, 2025 (Doc. 19). Plaintiff filed a Reply Brief on September 11, 2025 (Doc. 20).

## APPLICABLE LEGAL STANDARDS

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). The first step is to determine whether the claimant is presently engaged in substantial gainful activity. *Id.* at § 416.920(a)(4)(i). If the answer is yes, then the claimant is not disabled regardless of their medical condition, age, education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no and the individual is not engaged in substantial gainful activity, the analysis proceeds to the second step. *Id.* at § 416.920(a)(4).

At step two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At step three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 416.920(e).

An individual's RFC is his or her ability do work despite the individual's impairments. *Id.* at § 416.945; *see also Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) ("RFC is the maximum that a claimant can still do despite his mental and physical

limitations."). "In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record and provide a 'narrative discussion' that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and '[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.'" *Passig v. Colvin*, 224 F. Supp. 3d 672, 680 (S.D. Ill. 2016) (quoting SSR 96-8).

At step four, the ALJ must determine whether the claimant retains the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the final step. *Id.* at § 416.920(a)(4).

At the fifth and final step, the ALJ must consider whether the claimant can make an adjustment to perform any other work considering the claimant's RFC, age, education, and work experience. *Id.* at § 416.920(a)(4)(v). If the claimant can make an adjustment to other work, then the claimant is not disabled. *Id.* at § 416.920(g). Conversely, if the claimant cannot, then the claimant is disabled. *Id.*

Notably, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). This Court's task is not to determine whether Plaintiff was, in fact, disabled at the relevant time, but instead to determine whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Id.* (internal citations omitted).

### THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record focuses on the specific medical records and opinions cited in the ALJ's decision that are the subject of Plaintiff's migraine-related challenges on appeal (*see* Doc. 15).

I.      *Selected Medical Records and Opinions*:

    a.  *Relevant Medical Records*

In June 2018, Plaintiff was assessed for Chiari malformation type I[4], chronic migraines without aura, chronic headaches, and intractable common migraines at a neurology appointment (Tr. 603). One week later, Plaintiff underwent an MRI that found "Chiari I malformation with cerebellar tonsillar ectopia measuring up to 1.0 cm." (Tr. 628). On August 15, 2018, Plaintiff returned to the neurology clinic and underwent Botox injections because she "has chronic migraines without aura [and] multiple oral medications have been tried without any success." (Tr. 597). At an office visit approximately two months later, Plaintiff stated she was suffering a headache of 8/10 pain, accompanied by light sensitivity and nausea (Tr. 592). She also reported approximately 20 headache days per month (Tr. 592). Plaintiff visited the neurology clinic in December 2018 for another round of Botox (Tr. 590). At that time, she reported daily headaches unless she had nerve blocks (Tr. 590).

Plaintiff returned to the neurology clinic with a headache in January 2019 and reported that she continued to have about 15 headache days per month (Tr. 584). She received nerve blocks and reported that her headache pain had gone down from a 6 out 10 to a 2 out of 10 (Tr. 589). In March 2021, Plaintiff returned for her third set of Botox

---

[4] Chiari malformation is a condition in which brain tissue extends into the spinal canal (*see* Tr. 50). It occurs when part of the skull is misshapen or smaller than is typical and the skull in turn presses on the brain and forces it downward. Specifically, Chiari malformation type 1 develops as the skull and brain are growing whereas Chiari malformation types 2 and 3 are typically present at birth. *See, e.g.*, MAYO CLINIC, *Chiari Malformation*, https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010 (last visited March 31, 2026).

injections and reported having 8-12 headache days per month (Tr. 580). Plaintiff subsequently had a fourth set of Botox injections in August 2019 and reported having 4 headache days per month (Tr. 578-579). Regarding those headaches, they were described as "starting in the occipital region, then holocephalic associated with blurriness in the right visual field, nausea, vomiting, photophobia and phonophobia. She usually goes to sleep due to headaches. Frequency was daily, lasting for 24hrs." (Tr. 578). Plaintiff appeared for a fifth round of Botox in November 2019, at which time she reported 3 headache days per week, with the increasing potentially being attributable to increased stress (Tr. 575). A sixth round of Botox occurred in April 2020 (Tr. 572-574). At that visit, Plaintiff reported an increase in headaches, with approximately 3 to 4 headache days per week, with headaches lasting the entire day (Tr. 573).

In June 2020, Plaintiff visited the neurology clinic and reported 3 to 4 migraines per month after Botox and approximately 15 tension headache days per month (Tr. 568). In September 2020, neurology records from when Plaintiff appeared for Botox indicate that she reported having about 2 migraine headache days per month and 4 headache days per month (Tr. 560). Plaintiff returned to the neurology clinic on January 20, 2021, for additional Botox injections related to migraines (Tr. 557). At that time, she reported 1 to 4 migraine headache days per month and 4 to 12 tension headache days per month (Tr. 557). In April 2021, Plaintiff again presented for Botox injections related to migraines (Tr. 553). Plaintiff stated that she usually has 3 to 4 migraine headache days per month and 6 to 7 non-migraine headache days per month (Tr. 553). However, it was reported in the same paragraph that Plaintiff's migraines were 1 to 2 times per month after Botox (Tr.

553). Moreover, it was noted that Plaintiff "says that she starts to have more headaches 1 to 2 weeks prior to the next Botox visit." (Tr. 553). Further Botox injections for Plaintiff's chronic migraines occurred in July 2021 (Tr. 549-551). At that time, Plaintiff reported 2 migraine headache days per month and 8 tension headache days per month (Tr. 550).

In October 2021, neurology records from another visit for Botox injections indicate that Plaintiff reported an increase in headache days due to difficult personal circumstances (Tr. 546). Thus, while her migraine days per month were reported at 1 to 2 days per month, she reported approximately 15 to 20 tension headache days per month (Tr. 546). At a visit in March 2022, Plaintiff reported that her headaches had been worsening and stated she had 3 migraines and 7 tension headaches in the past month (Tr. 540). Thereafter, at a neurology follow-up appointment in July 2022, Plaintiff reported increased neck and back pain as well as approximately 7 headaches per month, each of 1 to 2 hours duration, that occurred in the bifrontal region (Tr. 533-534). While Plaintiff's migraines were also described in this report, no information was recorded regarding their monthly frequency (Tr. 534).

At a neurology appointment on January 10, 2023, Plaintiff reported severe neck and back pain, and at least 15 headaches per month, each of which lasted all day (Tr. 656). Subsequently, at a follow-up appointment on April 12, 2023, Plaintiff again reported chronic back and neck pain, and experiencing 10 headaches per month, 2 to 3 of which were migrainous (Tr. 650-651). Plaintiff had another neurology follow-up appointment in July 2023 (Tr. 646). At that visit, she reported 6 to 7 headache days per month, 2 of which were migrainous (Tr. 646). However, Plaintiff also indicated that she had seen

some improvement with the use of the migraine medication Qulipta (Tr. 646). Neurology clinic notes from Plaintiff's follow up appointment on October 23, 2023, indicate that Plaintiff reported an increase in headaches at that time, such that she was experiencing daily headaches (Tr. 693). "She reports otherwise outside of this last week her headaches have been well controlled with Qulipta, with about 5-6 headache days a month, 2-3 of which are migrainous." (Tr. 693). On January 8, 2024, neurology clinic notes document that Plaintiff reported an increase in headaches in the past month due to stress from family health concerns and other personal circumstances (Tr. 735). Specifically, Plaintiff reported having 3 migraines in the past week (Tr. 735). She was continuing to take Qulipta as prescribed and did not desire to make changes to her medication regime at that time because she wanted to see if her migraine situation improved after the stressful circumstances she was facing had passed (Tr. 735). Additionally, provider notes from that appointment stated, "Patient [and] I did have a long discussion in regards to her seeking to file disability due to her migraine headaches. Discussed with patient from neurologic Viv at this time, I do not note any contraindication for her to work at this time. Did discuss that I would be happy to provide something such as intermittent FMLA should patient need to miss work due to migraine headache, but would not be completing disability paperwork at this time as this does not deem medically necessary from neurologic standpoint as stated above." (Tr. 739).

   b. *Relevant Medical Opinions*

On December 14, 2022, Plaintiff visited Dr. James Gatton for a consultative examination (Tr. 630-637). Dr. Gatton's examination focused upon Plaintiff's alleged

physical limitations and did not discuss or analyze her history of migraines (Tr. 636-637). Ultimately, Dr. Gatton's impression was that Plaintiff "should be able to walk for three to four hours out of an eight-hour day. The claimant probably could carry less than 10 pounds frequently and could carry more than 20 pounds on occasion. Sitting, handling objects, hearing, and speaking are normal." (Tr. 637).

On January 4, 2023, Plaintiff visited Dr. Jonathan Thomas-Stagg for a consultative psychological examination (Tr. 640-643). Notably, Plaintiff reported a history of Chiari malformation and having migraines twice a week that lasted for 2 to 3 days (Tr. 640). Additionally, "[a]ccording to the claimant, her biggest barrier to working are her physical limitations due to Chiari malformation." (Tr. 642). After reiterating Plaintiff's history of Chiari malformation, Dr. Thomas-Stagg concluded that Plaintiff's symptoms were consistent with depression (Tr. 643).

State agency medical consultants prepared disability determinations in January 2023 (Tr. 68-86) and September 2023 (Tr. 89-100, 102-113). In regard to Plaintiff's Chiari malformation, migraines, and headaches, the disability determinations noted Plaintiff's history regarding those issues and imposed certain exertional and environmental limitations in response (Tr. 73-74, 82-83, 96-97, 109-110). For example, the state agency consultants found Plaintiff should avoid concentrated exposure to hazards such as machinery and heights due to her history of headaches and back pain (Tr. 74, 83, 97, 110). Furthermore, the state agency consultants found that Plaintiff retained the mental capacity to "understand, remember, concentrate and persist sufficiently in order to carry

out more than simple, routine but less than complex duties for a normal work period" and the physical RFC to perform light work (*see, e.g.*, Tr. 111-113).

Nurse Jennifer Kistner prepared a provider statement on Plaintiff's physical and mental impairments in February 2024 (Tr. 740-741). Nurse Kistner reported that she began treating Plaintiff in August 2019 and saw Plaintiff approximately every 1 to 2 months thereafter (Tr. 740). Plaintiff's diagnoses were "anxiety, GERD, migraines, back pain, chiari malformation type I, congenital heart anomaly, seizure, [sic], morbid obesity." (Tr. 740). Nurse Kistner opined that Plaintiff's had approximately 8 to 10 "bad days" in a 28 day period and would need a job that permits her to lie down for migraines (Tr. 740). She reported, Plaintiff "has dealt with migraines since a teenager. She was diagnosed with Chiari malformation at the age of 22. She has seen neurology for this and despite treatment suffers 2-3 times weekly with debilitating migraines." (Tr. 741).

II.    *The Administrative Hearing*:

An administrative hearing was held via videoconferencing before ALJ Johns on February 8, 2024 (Tr. 42-67). Plaintiff appeared alongside her attorney William Totten (Tr. 42). Vocational Expert Diane Regan also appeared and provided testimony (Tr. 62-67).

After addressing certain evidentiary matters, the hearing commenced with Plaintiff's counsel making an opening statement, which argued that due to Plaintiff's Chiari malformation and migraines, Plaintiff must be considered disabled because she would need to be absent or off task too frequently to maintain employment (Tr. 50-51). After those opening remarks, the ALJ asked Plaintiff some questions about her past employment and personal circumstances (Tr. 52-55). Plaintiff testified that she lived in a

single-story home with her two teenage children (Tr. 52-53). She drove approximately two times per week, typically for drives of around 10 minutes per direction (Tr. 53). Although Plaintiff briefly worked a few jobs, her primary employment history came from her time as a kitchen aide (Tr. 54-55).

When the ALJ asked Plaintiff what was preventing her from working, she said the primary reason she could not work was due to her migraines (Tr. 55-56). "They're pretty severe most days. I have to be in a dark room, no sound. Sometimes I'll just have to sleep, and sleeping doesn't necessarily help. I do take medicine, and that might help. It's a toss-up." (Tr. 56). Plaintiff testified that she experienced migraines at least three times per week and had headaches almost every day (Tr. 56). Additionally, Plaintiff stated she could walk for approximately 20 to 30 minutes before she had to sit down, and she likewise could only sit for 20 to 30 minutes (Tr. 56). In both instances, the reason she could not perform those activities for longer was due to pain that started in her neck and shot down her back (Tr. 56).

The ALJ asked Plaintiff if she had any triggers for her migraines, to which she answered, "[t]hey just come on. They don't give me any – hey, I'm going to come. You better get ready." (Tr. 57). Plaintiff then discussed her daily activities, explaining that she attempts to go to her children's sporting events, but has to bring a chair because she cannot sit in the bleachers (Tr. 57). She indicated that if a headache or migraine came on, she would try to push through but there are times she is unable to do so (Tr. 58). Plaintiff also indicated that she was experiencing a headache at that time, and for those types of headaches she would treat them with Advil (Tr. 58). She believed that stress triggered her

headaches, and the primary source of stress she dealt with was due to her children's father (Tr. 58).

Plaintiff's counsel then questioned Plaintiff about her migraines (Tr. 59). Plaintiff testified that she first started experiencing migraines in 2014 (Tr. 59). And even though Plaintiff took medication for her migraines, they had become worse by the time she stopped working in March 2019 (Tr. 59). In fact, Plaintiff said that she had tried 13 different medications for her migraines, but those medications typically only worked for a few months before they wore off and were no longer effective (Tr. 59). Plaintiff also explained that she had attempted to treat her migraines with Botox injections for several years and she believed those injections helped, but not enough to allow her to work a full-time job (Tr. 60).

Plaintiff's counsel then asked her if she could work at all on a day that she experienced migraines (Tr. 60). Plaintiff answered no and explained that when she experiences a migraine, she must lie down for at least five hours in a dark room with no sound (Tr. 60). After five hours or so had passed, she would not feel "a lot better, but [she] could at least function a little bit." (Tr. 60). She also stated that her children assist her in doing housework, although she tried to take care of certain chores like sweeping, laundry, and occasionally dishes (Tr. 60-61). In doing those activities, however, she could only do them for 20 minutes or so before requiring a 10 to 15 minute break due to pain starting in her neck that goes down her back (Tr. 61). Counsel next asked Plaintiff if her migraines affect her ability to maintain attention, to which she answered that they do (Tr.

61). Specifically, she stated that when she has a migraine, she can maintain her attention for five minutes at most (Tr. 61).

VE Regan began her testimony by classifying Plaintiff's past work as a kitchen aide, DOT code 318.687-010, which was an unskilled position that was generally and actually performed at the medium level (Tr. 63). The ALJ then posed the following question:

> So, Ms. Regan, please assume – I'm going to ask you a couple – I'm going to ask you a hypo. And then, I'm going to ask you about some other kind of off-task type things. But please assume an individual of the same age, education and work history as the Claimant. Further assume that this individual can perform light exertional work as defined in the DOT. However, this individual could never climb ladders, ropes or scaffolding, could occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl. This individual would need to avoid concentrated exposure to hazards, as hazards is defined in the SCO. This individual can understand, remember and carry out simple instructions, can have occasional interaction with the public, co-workers and supervisors, and can handle occasional changes in a routine work setting. Now, with those limitations, would there be past work available?

(Tr. 63). VE Regan responded that no past work would be available under that hypothetical. However, when asked if there would be other work available in the national economy for that hypothetical individual, VE Regan said "[a]t the light, unskilled level, there is packer, 559.687-074, 60,000 jobs, a sorter, 788.687-106, 40,000 jobs, a small products assembler, 729.687-010, 50,000 jobs." (Tr. 63-64).

The ALJ then asked VE Regan if her answer would change if the hypothetical individual "would, on occasion – occasion [a]s defined in the DOT – on occasion, would be unable to maintain attention for more than 20 minutes[.]" (Tr. 64). The ALJ then clarified this question by explaining that he wanted to know if work would exist for a

hypothetical individual who, for up to one-third of the day could not maintain attention for more than 20 minutes (Tr. 64). VE Regan answered that such a scenario exceeds off-task time limits and would eliminate all competitive employment (Tr. 64).

VE Regan then testified that for unskilled employment, employers would not tolerate an employee who was off task 15% of time or more (Tr. 65). Relatedly, VE Regan stated that employers would not tolerate an employee who missed more than one full day of employment per month (Tr. 65). In response to a question by Plaintiff's counsel, VE Regan said that employment would be precluded if an individual needed to lie down at any time other than on a scheduled break (Tr. 65). However, she believed that if an employee needed one unscheduled 15-minute break per month, employers would usually accommodate such a request (Tr. 65). But they would not accommodate a second unscheduled break and therefore, a second unscheduled break would preclude all employment (Tr. 65). Finally, VE Regan said that her testimony was either consistent with the DOT or based on her experience (Tr. 66).

## THE ALJ'S DECISION

The ALJ's decision followed the five-step analytical framework described above (*see also* Tr. 21-22). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 30, 2019 (Tr. 22). At step two, the ALJ found Plaintiff had the severe medical impairments of "obesity, depression, anxiety, chiari malformation type 1, bilateral knee osteoarthritis, and lumbar spine degenerative disc disease (20 CFR 404.1520(c) and 416.920(c))." (Tr. 22). Conversely, the ALJ found that "there is no objective medical evidence to suggest the claimant's gastroesophageal reflux

disease, left ankle fracture, and seizures more than minimally affect the claimant's ability to perform basic work functions." (Tr. 23).

At step three, the ALJ held that Plaintiff's impairments, considered individually or in combination, did not meet or medically equal the criteria of any impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 23-26). Pertinently, regarding Plaintiff's Chiari malformation, migraines, and tension headaches, the ALJ stated:

> Regarding the claimant's symptoms from chiari malformation, migraines and tension headaches, and exacerbating factor of stress, SSR 19-4p was considered in arriving at the residual functional capacity. There is no evidence of the severity, frequency, or intensity of a headache disorder alone or in combination with other impairments to show the severity of symptoms from headaches to meet or medically equal any listing of impairments. The claimant's symptoms were considered in arriving at the residual functional capacity. The claimant's allegations of migraines symptoms from chiari malformation as well as of the claimant's mental health impairments and exacerbating factor of stress were considered with the hazard, simple instructions, and occasional changes in routine work setting limitations (SSR 19-4p).

(Tr. 24). Thereafter, the ALJ considered Plaintiff's mental impairments and found Plaintiff had moderate limitations in all four broad areas of mental functioning (Tr. 24-25). Nevertheless, "[b]ecause the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied (Tr. 25). The ALJ further explained that the RFC formulated in the next section of the decision accounted for Plaintiff's moderate mental limitations (Tr. 26).

Before reaching step four, the ALJ formulated Plaintiff's RFC, finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except never climb ladders, ropes, or scaffolding; occasionally climb ramps and stairs; and occasionally

> balance, stoop, kneel, crouch, and crawl. Avoid concentrated exposure to hazards as defined in SCO; can understand, remember, and carry out simple instructions; occasional interaction with the public, coworkers, and supervisors; and can deal with occasional changes in a routine work setting.

(Tr. 26).

In discussing Plaintiff's RFC, the ALJ first recounted Plaintiff's hearing testimony (Tr. 26-27). The ALJ then found that, although claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision."  (Tr. 27). Significantly, "[t]he evidence of the record does not support a finding that the claimant's conditions are of such a severity to prevent the performance of the above residual functional capacity assessment." (Tr. 27).

In support of this determination, the ALJ recounted the plethora of medical records documenting Plaintiff's Chiari malformation, migraines, and headaches (Tr. 27-32). Beginning in 2018, the ALJ discussed Plaintiff's neurological appointments that diagnosed Plaintiff with Chiari malformation, chronic migraines, and chronic headaches (Tr. 27). The ALJ also observed that in 2019, Plaintiff's "headache days per month" decreased with Botox injections (Tr. 27). At a neurology appointment in July 2020, Plaintiff indicated she had headaches approximately 3 to 4 times per month lasting about 4 hours (Tr. 28). Likewise, in January 2021, Plaintiff reported having approximately four migraines per month, which typically lasted four hours (Tr. 28). However, the ALJ then pointed to later 2021 medical appointments wherein Plaintiff reported her migraines

were at a frequency of 1 to 2 times per month and tension headaches between 8 and 20

times per month (Tr. 28). In March 2022, Plaintiff reported three migraine headaches and

seven tension headaches per month (Tr. 29).

The ALJ recounted Plaintiff's consultative psychological examination from

January 4, 2023, stating "[s]he reported her multiple medications helped her headaches

and had migraines 2-3 times a week, but she did not report this frequency of migraines

in recent neurology records." (Tr. 29). However, the ALJ then noted how Plaintiff

complained of back and neck pain, an episode of incontinence, and 15 headaches per

month at her neurology appointment just six days later (Tr. 30). The ALJ's decision also

observed that Plaintiff reported in July 2023 that she had two migraine headaches per

month, which were less severe after starting Qulipta (Tr. 30). The ALJ then took particular

note of a neurology appointment Plaintiff had on October 23, 2023, stating:

> At neurology on October 23, 2023, the claimant said that until last week her
> headaches and been *very well controlled with Qulipta*. She occasionally
> took Benadryl that help relieve headaches along with Rizatriptan. The
> claimant said she filed for disability for back pain that limited her ability to
> work. She denied any incontinence or paresthesia. Examination revealed a
> BMI of 41. She complained of exacerbation of back pain with an antalgic
> gait. She had intact strength, and no abnormal neurological findings were
> noted. She was prescribed Prednisone, and *she was advised regarding
> disability form that from a neurological perspective there was no
> contraindication for the claimant to work* (Exhibit 6F 19-23).

(Tr. 30) (emphasis added). The ALJ also pointed out a January 8, 2024, neurology

appointment wherein Plaintiff reported three migraines a week that were potentially due

to increased stress (Tr. 31).

Given these medical records, the ALJ reiterated that the "alleged severity and duration of claimant's symptoms and limitations are inconsistent with the treatment history and the objective evidence." (Tr. 31). The ALJ further summarized Plaintiff's medical records related to migraines and found "[t]he record does not support her allegations of persistent and ongoing migraine headaches three times a week." (Tr. 31). Additionally, the ALJ emphasized that Plaintiff did well in the consultative psychological examination and indicated her migraine and psychotropic medications were beneficial (Tr. 32). "The claimant's neurologists indicated the claimant did not have any impairments that interfered with work." (Tr. 32). Accordingly, the ALJ concluded that Plaintiff functioned at a higher level physically and psychologically than alleged (Tr. 32). He observed that she was "doing foster care babysitting, healthcare for children, drove, shopped, did chores, prepared meals, and had no trouble with finances." (Tr. 32).

The ALJ continued on by discussing the medical opinions and administrative medical findings in the record (Tr. 32-34). Focusing upon medical opinions related to Plaintiff's migraines and headaches, the ALJ noted that Nurse Kistner opined that Plaintiff's primary symptom was headaches with debilitating migraines occurring 2 to 3 times per week, which would mean she would miss 100 days of work per year (Tr. 33). The ALJ found this opinion was not persuasive because "her migraines are managed well with medications" and "the record shows her migraines are typically 1-2 times a month for a few hours." (Tr. 33).

Finally, the ALJ explained that his RFC analysis accounted for the symptoms of Plaintiff's Chiari malformation by limiting Plaintiff to light work and by including

additional limitations regarding "hazards, simple instructions, occasional changes in routine work setting, and reduced interaction of the residual functional capacity." (Tr. 34).

At step four, the ALJ relied upon the testimony of VE Regan to find that Plaintiff was unable to perform her past relevant work (Tr. 34). Lastly, at step five, the ALJ again relied on the testimony of VE Regan to find that an individual with Plaintiff's RFC would be able to perform the requirements of representative light SVP 2 occupations such as:

> Packer, DOT 559.687-074, with 60,000 jobs nationally.
> Sorter, DOT 788.687-106, with 40,000 jobs nationally.
> Small products assembler, DOT 729.687-010, with 50,000 jobs nationally.

(Tr. 35). For this reason, the ALJ found Plaintiff was not under a disability, as defined by the Social Security Act, from March 30, 2019, through the date of the decision (Tr. 35).

### ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues (*see* Doc. 15):

1. Whether the Commissioner erred as a matter of law by failing to adequately evaluate Plaintiff's migraines and failing to account for limitations from Plaintiff's migraines?
2. Whether the RFC is not supported by substantial evidence because the ALJ failed to adequately evaluate Plaintiff's subjective statements in violation of SSR 16-3p?

### DISCUSSION

Plaintiff argues the Commissioner erred by failing to account for her Chiari malformation, migraines, and tension headaches both in considering if she met a listing at Step 3 and in formulating her RFC (Doc. 15 at pp. 8-14). More specifically, Plaintiff alleges that: (1) the ALJ would have found that her impairment medically equaled Listing

11.02B if the ALJ adequately accounted for her migraines and their resulting symptoms (*Id.* at pp. 10-11); and (2) the ALJ's RFC formulation failed to account for any absenteeism or time off task that would occur as a result of her Chiari malformation, migraines, and headaches (*Id.* at pp. 11-14). In response, Defendant contends that the ALJ: (1) provided adequate explanations for discounting Plaintiff's claims regarding the intensity and frequency of her migraines and headaches; and (2) reasonably accounted for her migraine-related limitations when formulating Plaintiff's RFC (Doc. 19 at pp. 3-7). The Court focuses its analysis upon Plaintiff's contention that the ALJ did not adequately explain or account for her Chiari malformation, migraines, and headaches when formulating her RFC because that issue is dispositive.

Before analyzing the parties' respective arguments, the Court believes it prudent to provide some background information about the challenges faced when making disability determinations based primarily upon migraines. As one district court within the Seventh Circuit aptly put it:

> Migraines are probably the most challenging impairment that regularly arises in disability claims. *See Krevs v. Saul*, No. 18-CV-1742, 2020 WL 58068 at *2 (E.D. Wis. Jan. 6, 2020). They are not subject to objective verification. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (noting that imagining is generally useful only to rule out certain possible causes of migraines); *see also* SSR 19-4p, § 2. Thus, determining the nature and extent of a claimant's impairment rests heavily on an assessment of the claimant's subjective symptoms, including how her symptoms respond to treatment. *See Overton v. Saul*, 802 F. App'x 190, 192 (7th Cir. 2020).
>
> Moreover, migraines are highly variable. Both the frequency and severity of a claimant's migraines may change over time, and migraines may even abate for lengthy periods. *See Hinds v. Saul*, 799 F. App'x 396, 401 (7th Cir. 2020). When a claimant is not suffering from a migraine, her functioning may be wholly unimpaired. *Krevs,* 2020 WL 58068, at *2, 2020 U.S. Dist. LEXIS 1236, at *4. Thus, when assessing a claimant's activities of

daily living under SSR 16-3p, the fact that she reports often engaging in robust activities is not as probative in the context of migraines as it may be with, for example, certain common physical impairments. An ALJ's assessment of a claimant's daily activities should take into account how her activities may vary between her good days and her bad days.

If a claimant suffers migraines that are severe enough to force her to miss work, just two migraines a month could be disabling. (Tr. 57 (vocational expert testimony that missing work more than once per month would preclude work).) For this reason, it is generally important for an ALJ to include an absenteeism rate when determining the RFC of a claimant who suffers from migraines. *See Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014).

When an ALJ accepts that a claimant suffers from migraines but concludes that she is not disabled, there are generally two possible explanations. Either the ALJ found that the claimant did not suffer migraines at a disabling frequency, or the migraines were not of a disabling severity (*i.e.*, the ALJ found that the claimant could work while suffering a migraine). *Cf. Krevs*, 2020 WL 58068, at *2 ("Thus, to assess whether a claimant's migraines preclude substantial gainful activity, it is necessary to assess both how often the claimant suffers migraines and how severe those migraines are.").

*Gould v. Kijakazi*, 21-CV-308, 2022 WL 541511, at *3 (E.D. Wis. Feb. 23, 2022).

Here, after summarizing Plaintiff's neurology records, the ALJ found that the "record shows her migraines are typically 1-2 times a month for a few hours." (Tr. 33). While Plaintiff takes issue with this determination and believes the medical record generally demonstrates a higher number of migraines and headaches per month, the Court need not delve into that challenge because the ALJ's finding that Plaintiff suffers 1 to 2 migraines per month still warrants remand under the specific facts of this case.[5] Put

---

[5] Plaintiff expresses understandable frustration with this finding because, as evinced by the medical records, 1 to 2 migraines per month was the lowest frequency of migraines Plaintiff reported at any time in the record, and ample records exist that would have supported a higher frequency finding. However, this Court is "not allowed to displace the ALJ's judgment by reconsidering facts or evidence." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (internal quotation marks and citations omitted). And while Plaintiff argues that the ALJ omitted discussion of several other records evincing the frequency, severity and duration of

simply, even when using the ALJ's finding regarding the number of migraines Plaintiff typically suffers per month, this alone demonstrates a clear error in the ALJ's decision because the ALJ explicitly found that Plaintiff suffered one to two migraines per month, yet he neither included any corresponding limitations for migraine-related absences or time off task when formulating Plaintiff's RFC, nor explained why no such limitations were required. *Wolfe v. Comm'r of Soc. Sec.*, 1:25-CV-00214-ALT, 2026 WL 653608, at *5 (N.D. Ind. Mar. 6, 2026) ("While the ALJ amply supported her discounting of the migraine frequency and intensity claimed by Wolfe in her symptom testimony and headache questionnaire (AR 59-60, 213-14), the ALJ failed to confront that even if Wolfe had just twenty-four migraines a year, as her neurologist estimated in February 2023 (AR 716), she still may not be able to maintain competitive employment based on the VE's testimony that an employer will tolerate only seven to eight absences a year."). "Specifically, the ALJ should have at least included in the RFC determination the likelihood of missing work. The ALJ's decision did not reflect any likelihood of absences or breaks at work related to migraines, and that is simply unsupported by the record." *See Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014).

The ALJ could have accounted for Plaintiff's migraine-related absences and time off task when formulating Plaintiff's RFC by either explaining: (1) why his monthly migraine finding was not relevant to Plaintiff's RFC,[6] or (2) how that finding was

---

Plaintiff's migraines, the Court declines to consider those challenges further because of the dispositive issue the Court has identified that already warrants remand.

[6] For example, if supported by the record, the ALJ could have built a logical bridge to his conclusion by pointing to records that evinced that Plaintiff could work through her migraines and would not miss work or be off task even when actively suffering from migraines.

adequately accounted for when formulating Plaintiff's RFC. Here, however, the ALJ failed to do either. Again, the ALJ specifically found that Plaintiff typically suffered 1 to 2 migraines per month (Tr. 33). That frequency finding of between one and two migraines per month is of particular significance because the VE unequivocally testified that anything more than one unscheduled absence per month would be preclusive (TR. 65). Suffice it to say, between one and two migraines per month implies an average of more than one migraine per month. Were this not the case, the ALJ would have and should have determined that Plaintiff suffers from one migraine per month, **at most**. (emphasis added). Therefore, given the ALJ's frequency finding and the VE's testimony, the only explanation that could have salvaged the ALJ's RFC determination was a finding that Plaintiff's migraines were not of a severity or duration that would require her to miss work or be off task (or relatedly, that Plaintiff's migraine limitations were sufficiently accommodated for in the ALJ's RFC).

Notably, however, the ALJ's decision neither makes such a finding as to severity and duration, nor points to evidence to support such a finding. To the contrary, the evidence in the record, which admittedly originates in Plaintiff's own testimony and subjective statements, repeatedly evinces that Plaintiff's migraines lasted for several hours to entire days and required Plaintiff to lie down in a quiet, dark room (*see, e.g.*, Tr. 56; 60). *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("[T]he ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it."). And again, the ALJ's own finding was that Plaintiff's "migraines are typically 1-2 times a month *for a few hours*." (Tr. 33) (emphasis added).

"Since [Plaintiff] stated that the only things that help manage her migraines once they begin are taking her medication and going into a dark room for several hours, it is unclear how the ALJ concluded that [Plaintiff] would not miss more than one day of work per month or would require no off-task time (particularly given the flaws in the subjective symptom analysis). The ALJ may well have decided that neither limitation was warranted based on the record at hand, but this Court is unable to ascertain whether the ALJ adequately considered these two potential RFC limitations. Without any actual discussion, the Court is prevented from conducting any sort of meaningful review[.]" *Michelle L. M. v. Kijakazi*, 222CV00151MKKJMS, 2023 WL 3835583, at *10 (S.D. Ind. June 6, 2023).

Accordingly, to the extent the ALJ believed Plaintiff's statements as to the effects and symptoms stemming from her migraines (and Chiari malformation) did not reflect the degree of limitation she alleged (i.e., the need to lie down in a dark room for several hours), the ALJ should have at least explained why he believed that to be so. Relying on the fact that Plaintiff could perform certain household chores and tasks at times when she did not have migraines was unquestionably an improper way to ignore Plaintiff's claimed migraine-related limitations. *See Gould*, 2022 WL 541511 at *3 ("An ALJ's assessment of a claimant's daily activities should take into account how her activities may vary between her good days and her bad days."). Likewise, summarily claiming that Plaintiff's migraines were "managed well with medications" does not adequately explain whether the ALJ believed that medications lessened the severity and duration of her

migraines to an extent that they would not cause a preclusive number of absences and/or time off task (Tr. 33).

Additionally, to the extent the ALJ believed Plaintiff's migraines were not severe because "[t]he claimant's neurologists indicated that the claimant did not have any impairment that interfered with work," the Court has concern with the ALJ's reliance upon that statement (Tr. 30, 32). First and foremost, the ALJ cherry-picked a small, favorable portion of that medical record to come to the conclusion that Plaintiff's neurologists indicated she did not have an impairment that interfered with work (Tr. 30; *see also* Tr. 739).[7] However, when viewed in its entirety, that specific medical record does not support such a sweeping conclusion (*see* Tr. 739). Instead, at that same appointment, the neurologist recorded that Plaintiff reported 3 migraines in the last week, which lasted several hours and made her feel nauseous (Tr. 735). Additionally, at the same time that the neurologist determined that there was no reason Plaintiff could not work, the neurologist also indicated that she "would be happy to provide something such as intermittent FMLA ***should patient need to miss work due to migraine headaches***." (Tr. 739) (emphasis added). *Kaminski v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018) (explaining that an ALJ may not cherry-pick favorable records while ignoring unfavorable records);

---

[7] The larger quote was as follows:

> Patient [and] I did have a long discussion in regards to her seeking to file disability due to her migraine headaches. Discussed with patient from neurologic Viv at this time, I do not note any contraindication for her to work at this time. Did discuss that I would be happy to provide something such as intermittent FMLA should patient need to miss work due to migraine headache, but would not be completing disability paperwork at this time as this does not deem medically necessary from neurologic standpoint as stated above.

(Tr. 739).

*Philip Ray B. v. Kijakazi*, 20-CV-50203, 2023 WL 3042866, at *3 (N.D. Ill. Apr. 21, 2023) ("[W]hen an ALJ relies primarily on just one part of the record, it is difficult to determine whether the ALJ has undergone the proper analysis. Here, the ALJ's failure to consider the entirety of Dr. Thornton's notes in her conclusion was improper."). In other words, without providing that critical context, the statement relied upon by the ALJ was clearly cherry-picked.

Moreover, beyond impermissibly cherry-picking a favorable quotation from the neurologist's notes, that particular quotation is also improper because it is opining on an issue reserved for the Commissioner (i.e., whether or not Plaintiff is disabled). *Khuzaie v. Comm'r of Soc. Sec.*, 1:14-CV-00199-SLC, 2016 WL 1253537, at *8 (N.D. Ind. Mar. 30, 2016) ("When a treating physician has opined on an issues reserved for the Commissioner, the opinion is never entitled to controlling weight or given special significance, because doing so would abdicate the Commissioner's role to the treating physician."). In fact, the neurologist's discussion of potential FMLA absences in the next sentence provides a fitting example of why disability determinations are reserved to the Commissioner (Tr. 739). This is because that statement demonstrates that the neurologist was merely finding that Plaintiff could work at times (presumably when she was not having migraines) and not in any way making a determination as to whether Plaintiff's migraines would preclude competitive employment due to absences and time off task. *See Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) ("And as for Yoon's opinion that Richison was 'disabled,' the ALJ correctly labeled that as an ultimate determination reserved to the Commissioner.").

Consequently, the only other potential means by which the ALJ could have attempted to account for Plaintiff's monthly migraines was finding that "they were considered with the hazards, simple instructions, occasional changes in routine work setting, and reduced interaction of the residual functional capacity." (Tr. 34). Yet, at no point does the ALJ connect the dots – and thus, build a logical bridge – by explaining how those limitations would avoid or minimize the severity of Plaintiff's migraines, such that she would not miss work or be off task for a preclusive amount of time. *See Krevs v. Saul*, 18-CV-1742, 2020 WL 58068, at *3 (E.D. Wis. Jan. 6, 2020) ("The ALJ stated that he accounted for Krevs's migraines by limiting him to jobs that allowed him to be off-task up to ten percent of the day. But the ALJ did not explain how he concluded that allowing Krevs to be off task ten percent of the day would sufficiently accommodate the effects of his migraines."). Ultimately, if the ALJ truly believed those limitations would account for migraine-related absences and time off task, then he should have provided a sufficient explanation as to why that was the case. *See id.*

Indeed, it is difficult to understand how any of those limitations would avoid or minimize the onset, severity, and/or duration of migraines Plaintiff experienced in such a way that absenteeism or time off task did not need to be accounted for in Plaintiff's RFC. No medical records or opinions were cited in support of the ALJ's belief that these limitations would sufficiently accommodate her migraines and the Court's own review has found nothing to bolster this statement. In addition, Plaintiff's migraine records primarily originate from a time when Plaintiff was not working and thus was already limiting herself in ways significantly beyond those contained in the ALJ's RFC (*see, e.g.,*

Tr. 646-651). *See Gould*, 2022 WL 541511 at *3 (Noting that the daily activities of a claimant who suffers migraines is less probative because "[w]hen a claimant is not suffering from a migraine, her functioning may be wholly unimpaired."). Yet, even while avoiding work entirely and only doing household chores on a timeline that worked for her (Tr. 60-61), the record and the ALJ's own findings both establish that Plaintiff continued to suffer severe migraines at a frequency of no less than 1 to 2 times per month (Tr. 33). Accordingly, the ALJ has not built a logical bridge to support his determination that Plaintiff's migraine-related time off task and absences would be accommodated for by the RFC limitations he imposed.

In summary, the Court finds that the ALJ's formulation of Plaintiff's RFC has failed to build a logical bridge between the ALJ's finding that Plaintiff suffers 1 to 2 migraines per month and his conclusion that no RFC limitations beyond those imposed were required to account for Plaintiff's potential migraine-related absences and time off task. Given the ALJ's own finding and the ample medical evidence of Plaintiff's prolonged history of migraines and migraine treatment, "the ALJ should have at least included in the RFC determination the likelihood of missing work. The ALJ's decision did not reflect any likelihood of absences or breaks at work related to migraines, and that is simply unsupported by the record." *Moore*, 743 F.3d at 1127. Consequently, because the VE's testimony was that Plaintiff would be precluded from all competitive employment if she was absent more than once per month or off task 15% of the time or more (Tr. 65), the ALJ's failure to build a logical bridge as to why no such limitations were imposed was clear error warranting remand. *Id.*

While the above error necessitates remand on its own, the Court also notes that the ALJ's decisions fails to discuss the separate, potential impact of Plaintiff's non-migrainous headaches. This is significant because medical records indicate that Plaintiff suffered from serious pain and other symptoms when experiencing those non-migrainous headaches (*see, e.g.*, Tr. 589-592). It may have been that the ALJ was simply not persuaded that those headaches were significant enough to warrant any additional considerations or limitations when formulating Plaintiff's RFC. But, even if that were the case, the ALJ should have stated as much and cited evidentiary support for that finding. By failing to do so, the Court can only guess as to whether the ALJ believed those non-migrainous headaches would impact Plaintiff's time off task and absenteeism rate. Moreover, because the ALJ's determination as to the frequency and duration of Plaintiff's migraines was already at or exceeding the VE's line for when work would be precluded due to time off task and absences, the failure to discuss the potential impact of Plaintiff's non-migrainous headaches is even more problematic.[8]

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled or that she should be awarded benefits. To the contrary, the Court has not formed any opinions in

---

[8] The ALJ did state that "[t]he claimant symptoms from chiari malformation and exacerbating factor of stress were considered with the hazards, simple instructions, occasional changes in routine work setting, and reduced interaction of the residual functional capacity." (Tr. 34). However, similar to the shortcomings identified above when considering this argument in the context of migraines, even if the Court construed that statement as implying that the ALJ accounted for Plaintiff's non-migrainous headaches by imposing limitations in Plaintiff's RFC, there is nowhere in the opinion that actually discusses why or how the imposed RFC limitations would address Plaintiff's headaches – let alone how they would prevent her from being absent or off task when headaches arose.

that regard and leaves those issues to be determined by the Commissioner after further proceedings.

<u>CONCLUSION</u>

The Commissioner's final decision denying Plaintiff's applications for DIB and SSI is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** March 31, 2026

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**